THOMAS M. O'CONNOR (SBN 172236)
O'Connor, Runckel & O'Malley LLP
1277 Treat Blvd., Suite 810
Walnut Creek, CA 94597
E-Mail: *tom@orolawfirm.com*
Telephone: (925) 939-5600
Facsimile: (925) 939-5601

Attorney for Defendant:
THOMAS LEGAULT

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>THOMAS LEGAULT<br><br>Defendant. | Case No. CR 11-00429 PJH<br><br>**SENTENCING MEMORANDUM OF DEFENDANT THOMAS LEGAULT**<br><br>Date:   September 20, 2017<br>Time:   2:30 p.m.<br>Court:  Hon. Chief Judge Phyllis J. Hamilton<br>Dept:   Courtroom 3 |

## I.   INTRODUCTION

Thomas Legault, through his counsel, Thomas M. O'Connor, hereby files the following Sentencing Memorandum setting forth additional factors for the Court to consider in determining Mr. Legault's sentence at the sentencing hearing scheduled for September 20, 2017.

As set forth in the Paragraph 9 of the Plea Agreement, the parties agree that the defendant's total offense level is 11 and the probation officer concurs in this calculation. (PSR ¶ 4, 35.) The probation officer's finding that Mr. Legault has no prior criminal history is not disputed

1

**DEFENDANT LEGAULT'S SENTENCING MEMORANDUM; CASE NO. CR 11-00429 PLH**

by the parties. (PSR ¶ 36-40.) Therefore, prior to any consideration of a downward departure pursuant to USSG §5K1.1 and any variance pursuant to 18 U.S.C § 3553(a), an offense level of 11, with a Category I Criminal History results in a sentencing guideline range of 8 to 14 months, within Zone C.

For the reasons set forth below, Mr. Legault moves this Court for a downward variance pursuant to 18 U.S.C. §3553(a), and a downward departure under § 5K1.1 based on the government's motion, and requests this Court impose a sentence of three years of probation and community service.

## II.  PRODEDURAL BACKGROUND

On August 11, 2011, Mr. Legault entered into a plea agreement and agreed to cooperate with the government's investigation of bid rigging at public foreclosure auctions in Contra Costa County. On October 12, 2011, Thomas Legault entered his original plea of guilty before this Court pursuant to a plea agreement with the government to one count of mail fraud and one count of bid rigging. On December 5, 2016, those pleas were withdrawn by stipulation and Thomas Legault pleaded guilty pursuant to a new written plea agreement to one count of bid rigging in Contra Costa County, in violation of 15 U.S.C. § 1 presided over by the Honorable Judge Westmore.

## III.  FACTUAL BACKGROUND

### A. Background of Mr. Legault

Thomas Legault is a 56-year old man with no history of criminal conduct. (PSR ¶ 39-43.) Mr. Legault was one of nine children raised by his parents. The family originally lived in Carmichael and subsequently moved to Concord, California. (PSR ¶ 46-47.) He attended and graduated from Olympic High School in Concord in 1979. (PSR ¶ 63.) Mr. Legault and his wife, Fatima Legault, were married on February 4, 1993 and have two adult children. (PSR ¶ 49-50.)

Mr. Legault's parents reside in an assisted living facility in Concord, California. Mr. Legault's father is exhibiting signs of dementia or Alzheimer's while his mother suffers from

chronic obstructive pulmonary disease, and has difficulty walking. Because his parents are elderly and in declining health, Mr. Legault is the co-trustee of his parents' trust. He visits with his parents, two to four times per week, depending on their needs. (PSR ¶ 45, 53.)

Mr. Legault started his real estate career in 1984. He currently owns Kropa Realty in Walnut Creek, California. Mr. Legault started as an agent with Kropa Realty in 1994. After the owner of Kropa Realty retired due to health issues, Mr. Legault took over ownership effective January 1, 2017. (PS ¶ 66-68.) Mr. Legault has a total of 19 employees that work for Kropa Realty that rely on him for employment.

Every November for the last 28 years, Mr. Legault has held a large turkey drive for the Food Bank of Contra Costa County. He began his turkey drive in 1990 and initially started by collecting frozen turkeys and then matching all donations. Approximately 10 years ago, his charitable effort expanded to donations of 3,500 pounds of turkeys. Due to the large volume of turkeys, he now collects and matches money donations and the Food Bank of Contra Costa County purchases the turkeys. Additionally, over the last few years, he has collected toys for the Toys for Tots program, and volunteers as a substitute driver for Meals on Wheels. (PSR ¶ 52.)

**B. The Offense Conduct**

The facts of this case are described in detail in paragraphs 6-22 of the Final Presentence Report (PSR). Mr. Legault agrees that this recitation of facts is true and accurate, and therefore a full recitation of the facts of his case will not be included herein. Mr. Legault would only highlight that his case differs from his co-conspirators because he only participated in properties he wanted to purchase, the very small number of bid-rigging transactions (6) in which he was personally involved, and his low volume of commerce ($764,605). (PSR ¶ 22.)

//

//

### C. Mr. Legault's Cooperation

In the present case, Mr. Legault began cooperating when contacted by the Federal Bureau of Investigation on January 11, 2011, as a search warrant was executed at his home. Even in a pre-plea agreement context, Mr. Legault confessed his wrongdoings and began cooperating with the government. On August 11, 2011, Mr. Legault entered into a formal cooperation and plea agreement. On October 12, 2011, Thomas Legault entered his original guilty plea before this Court pursuant to the plea agreement with the government. Mr. Legault has fully cooperated with all requests of the government and accepted full responsibility for his role in the case.

Mr. Legault participated in an F.B.I. interview, an interview with the government and an additional pre-trial session with the government. Mr. Legault was never called to testify in any of the subsequent trials.

## IV.   ARGUMENT

### A. Legal Standard

As the Court is aware, under *United States v. Booker*, 125 S.Ct. 738 (2005), a sentencing court must now "impose a sentence sufficient, but not greater than necessary" to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. 18 U.S.C. § 3553(a) and (a)(2). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir 2008).

After *Booker*, there is no limitation on the information concerning the background, character, and conduct of the defendant which a court may receive and consider for the purposes of imposing an appropriate sentence. In *United States v. Bragg*, 582 F. 3d 965 (9th Cir. 2009), Judge Noonan observed that in:

> [d]eciding this appeal, we take our cue from the sage advice of Justice Stevens speaking for the Court in *Gall* v. *United States*. Each case of sentencing is a unique case. A human person is being subjected to the force of the state. The sentence cannot be calibrated mechanically by looking at a chart of possible penalties. The district court has discretion to take into consideration all factors in the record.

582 F. 3d at 968 (citations omitted), see also *United States v. Whitehead*, 532 F. 3d 991(9th Cir. 2008) (one theme runs through the Supreme Court's recent sentencing decisions: *Booker* empowered district courts to engage in individualized sentencing). These cases hold that the Court must now consider factors such as the defendant's family ties, health or age that were effectively precluded from consideration under that mandatory guidelines regime. 18 U.S.C. § 3661.

In *Gall v. United States*, 128 S. Ct. 586, 598 (2007), *Kimbrough v. United States*, 128 S.Ct. 558 (2007), the Supreme Court set forth the proper analysis that district courts should follow in evaluating a proper sentence in the wake of *United States v. Booker*, 543 U.S. 220 (2005):

> A district court should begin all sentencing proceedings by correctly calculating the applicable Guideline range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In doing so, he may not presume that the Guideline range is reasonable. He must make an individualized assessment based on all the facts presented. If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. *Gall*, 128 S.Ct. at 596-97 (citations omitted).

Additionally, the Court is free to disagree with the Guideline ranges and policy considerations. *See Kimbrough v. United States*, 128 S.Ct. at 558. "It has been uniform and consistent in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Id.* at 598 (citing *Koon v. United States*, 518 U.S. 81, 113 (1996)). After *Gall*, federal district courts possess great discretion on a case-by-case basis in handing down a sentence.

//

//

## B. Relevant § 3553 Factors and Goals

### 1. The Following Factors Warrant a Variance From the Advisory Guidelines.

Specific characteristics of individual defendants, which district courts were once prohibited or discouraged from considering, may now be considered. *See Rita v. United States*, 551 U.S. 338, 364-365 (2007) (Stevens, J., concurring) ("Matters such as age, education, mental, or emotional condition, medical condition, employment history, lack of guidance as a youth, family ties, or military, civic, charitable, or public service are not ordinarily considered under the guidelines . . . These are, however, matters that section 3553(a) authorizes a sentencing judge to consider"); *United States v. Lazenby* 439 F.3d 928, 933 (8th Cir. 2006) ("the other factors cited by the district court, though discouraged or prohibited departure factors under the mandatory guidelines, may be considered in applying the section 3553(a) factors under *Booker*"). In this case, the following factors warrant a variance from the advisory guidelines:

Mr. Legault played a minor role in the conspiracy when compared to his co-conspirators given his stipulated level of commerce ($764,605) and the small number of bid-rigging transactions in which he was personally involved. (*See, United States v. Gomez*, 215 F.Appx 200 (4th Cir. 2007)).

Mr. Legault is a first-time offender and prison has greater significance for those imprisoned for the first time. (*See, United States v. Paul*, 239 F. Appx 353 (9th Cir. 2007)). Additionally, he has had 6 years of law-abiding life since the last date of his conduct and has had a prolonged period of time to wait since commencement of the offense and sentencing. This long period has taken a toll on Mr. Legault's health. (PSR ¶ 59-60.)

Mr. Legault has otherwise outstanding character as described in the many letters submitted on his behalf. (*See, United States v. Wachowiak*, 496 F.3d 744 (7th Cir. 2007)). See, Exhibit A. As evidenced by the letters written on his behalf, Mr. Legault's conduct in this case was aberrant

behavior and was not typical of his personal characteristics. (*See* Section 5K2.20 of the Guidelines and *United States v. Howe*, 543 F.3d 128 (3rd Cir. 2008) and *United States v. Autrey*, 555 F.3d 864 (9th Cir. 2009)). See also, Exhibit A.

Mr. Legault has an excellent employment history. *United States v. Whitehead*, 532 F.3d 991 (9th Cir. 2008). In addition, Mr. Legault has a long track record of good deeds and past integrity in the community. *United States v. Woods*, 159 F.3d 1132 (8th Cir. 1998). See also, Exhibit A.

Furthermore, Mr. Legault has suffered the collateral consequences of public disgrace within his community, loss of various benefits and citizen rights due to being a felon, loss of financial stability, loss of future employment opportunities and certain licenses. Mr. Legault asks this Court to find that the appropriate sentence in the instant offense is one that will adequately punish him, but will not contradict the recognized purposes of sentencing.

## 2. A Comparison to Other Sentenced Defendants in the Bid Rigging Conspiracy Warrants a Variance from the Advisory Guidelines.

This Court has sentenced several other defendants in this same bid rigging conspiracy. Importantly, Mr. Legault's volume of commerce and bid rigging transactions are considerably less than any of those individuals. The sentenced cooperating defendants' volumes of commerce has ranged from approximately $2 million to nearly $13 million with bid-rigging transactions ranging from roughly 30 to 275. Mr. Legault's volume of commerce, by comparison, was stipulated to be $764,605 which includes a total of 6 bid rigging transactions. (PSR ¶ 22.) Additionally, Mr. Legault only participated in properties he wanted to purchase and was not involved simply to be paid off by his co-conspirators. This Court has sentenced other cooperating defendants to a term of probation, with an added condition of electronic monitoring. Assuming this Court will also consider sentencing Mr. Legault to a term of probation, he proposes community service hours, in lieu of electronic monitoring.

**DEFENDANT LEGAULT'S SENTENCING MEMORANDUM; CASE NO. CR 11-00429 PJH**

### 3. A Downward Departure is Warranted Under U.S.S.G §5K1.1

This Court may consider Mr. Legault's cooperation under 18 U.S.C. § 3553, as well as in ruling on the government's motion for downward departure. *See, United States v. Robinson*, 741 F.3d 588, 599 (5th Cir. 2014). Mr. Legault began cooperating on January 11, 2011, when contacted by the agents from the Federal Bureau of Investigation. On August 11, 2011, Mr. Legault entered into a formal cooperation and plea agreement with the government and originally entered a guilty plea on October 12, 2011.

Mr. Legault was one of the first individuals to agree to cooperate in the government's investigation and entered a guilty plea at the very beginning of the case. Given the timing of his decision to cooperate and plead guilty, he likely influenced many other co-conspirators to plead guilty as well.

Over the last six years, Mr. Legault participated in an F.B.I. interview, a proffer session with the government and an additional pre-trial session with the government. Mr. Legault was never called to testify in any of the subsequent trials, but remained willing to do so. Even with the limited number of bid rigging transactions in which Mr. Legault participated, his interviews resulted in 21 pages of 302s provided by the government.

The value of Mr. Legault's cooperation supports a variance from the Sentencing Guidelines in addition to any departure requested by the government. *See U.S. v. Udo*, 963 F.2d 1318, 1319 (9th Cir. 1992) (once the government makes a motion, court can depart more than the government recommends.)

### 4. A Probation Sentence Will Effectuate the Sentencing Goals of § 3553.

Mr. Legault has never been to jail or prison; he has no convictions on his record; he has a supportive family and community of friend and colleagues; he employs nineteen people at his business; he works hard to provide for his family; and he has a long-standing record of giving back to his community. The sentence proposed by Mr. Legault is significant to him. Mr. Legault will forever suffer the consequences of a convicted felon.

**DEFENDANT LEGAULT'S SENTENCING MEMORANDUM; CASE NO. CR 11-00429 PJH**

Mr. Legault deeply regrets his conduct and the poor choice of participating in an existing bid rigging conspiracy on the Contra Costa County Courthouse steps. Although not an excuse for his conduct, Mr. Legault explained he was pressured to participate by those co-conspirators who were already initiating rounds and payouts. (PSR ¶ 25.) When Mr. Legault agreed to participate, he operated at the direction of other co-conspirators and never initiated any of the 6 rounds he participated in.

Assuming this Court will sentence Mr. Legault to a term of probation, he respectfully requests a sentence of community service in lieu of electronic home monitoring. Mr. Legault proposes that justice and the sentencing goals would be served if this Court sentenced him to serve the community which was harmed by his involvement in bid rigging. Serving the disadvantaged and less fortunate people of Contra Costa County and the Bay Area would be a way for him to spend his non-working time in a productive manner rather than spending it at home if sentenced to electronic home detention.

This sentence is justified given Mr. Legault played a minor role in the conspiracy and his volume of commerce was far less than his fellow co-conspirators. In the end, Mr. Legault may be the lowest-level conspirator that is sentenced before this Court. Additionally, he was one of the first to cooperate with the government. Therefore, Mr. Legault respectfully requests that his sentence reflect these mitigating factors.

//
//
//
//
//
//
//

DEFENDANT LEGAULT'S SENTENCING MEMORANDUM; CASE NO. CR 11-00429 PJH

## V. CONCLUSION

Mr. Legault respectfully requests this Court use its discretion to depart from the advisory sentencing guidelines based on his level of cooperation and § 3553 factors, and sentence him to a probationary term and community service. A probationary, non-custodial sentence, would serve the goals of punishment.

DATED: September 13, 2017

Respectfully submitted,

O'CONNOR, RUNCKEL & O'MALLEY, LLP

By: /s/
Thomas M. O'Connor
Attorney for Defendant
THOMAS LEGAULT